IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 19-00357-01-CR-W-BP |
| ) | |
| DYQWON D. BROWN, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION TO
## DENY DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant's Motion to Suppress Evidence and Statement.[1] (Doc. 32) Defendant moves the Court to suppress all evidence recovered from his clothing on April 21, 2019. For the following reasons, Defendant's motion should be denied.

### I. INTRODUCTION

An Indictment was returned on October 24, 2019, charging Defendant with one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On January 15, 2021, Defendant filed a motion to suppress. (Doc. 32) The Government responded on February 10, 2021, (Doc. 39), and Defendant replied on February 12, 2021 (Doc. 40). An evidentiary hearing was held on February 26, 2021, with all parties and counsel appearing in person. The Government appeared by Assistant United States Attorney Ashleigh Ragner. Defendant was present, represented by appointed counsel S. Chase Higinbotham, Jr. The Government called Security Officer Terrance Cosby;[2] Kansas City, Missouri Police Department

---

[1] Although the motion is captioned "Motion to Suppress Evidence and Statement" the motion does not identify, nor does the evidence of record contain, any statement made by Defendant.
[2] Mr. Cosby worked as an account manager for GardaWorld Security Company when he testified at the suppression

1

Detective Deryck Galloway; and Kansas City, Missouri Police Department Officer Jacob Alexander to testify. No exhibits were admitted into evidence.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1. Research Medical Center employs private security officers and off-duty Kansas City, Missouri Police Department officers for extra security. (Tr. at 7-10, 27) The hospital employs one off-duty police officer twenty-four hours a day, every day of the year; every shift is not always filled. (Tr. at 26)

2. When a police officer works for Research Medical Center during this off-duty shift, he or she is not working for the police department. (Tr. at 25) Off-duty jobs are, however, reported to the police department. (Tr. at 25)

3. Research Medical Center likes the off-duty police officers to remain in the Emergency Room in order to assist with maintaining the safety and security of staff and patients. (Tr. at 9-10, 26-27)

4. An off-duty police officer is generally stationed in the secured portion of the Emergency Room, referred to as "Pod 3." (Tr. at 9) Pod 3 is reserved for overdose patients and individuals with mental concerns who may exhibit assaultive behaviors. (Tr. at 9, 27)

5. When an individual arrives at Research Medical Center for treatment of injuries sustained from a trauma, he or she is assigned a trauma number; the patient's name is not used for identification. (Tr. at 10, 32)

6. After the individual is placed in a trauma room, doctors and nurses try to stabilize the individual and identify injuries. (Tr. at 12-13) The individual's clothes are taken or cut off and put in a pile on the floor. (Tr. at 13)

7. A private security officer then enters the trauma room, grabs the clothing, and checks the clothing for weapons and contraband. (Tr. at 13, 17) Examples of contraband include, but are not limited to, knives, screwdrivers, guns, ammunition, and controlled substances. (Tr. at 13)

---

hearing. (Tr. at 7) On the date of the search at issue, however, he was a security guard for a company called "G4S" that provided private security services at Research Medical Center. (Tr. at 7-8) He will, therefore, be referred to as "Security Officer Cosby" in this Report and Recommendation.

2

8. Pursuant to Research Medical Center policy, the belongings of all trauma patients are searched by a private security officer. (Tr. at 14-15, 31) The off-duty police officer never performs the search or directs that a search be conducted. (Tr. at 14-15, 31, 32)

9. The private security officer performing the trauma search does not know the name of the individual to whom the clothing belongs or any details about how the injuries were sustained. (Tr. at 14)

10. This trauma search is performed in every trauma case. (Tr. at 11) It is not limited to situations where criminal conduct could be involved.[3] (Tr. at 11-12) Between three and eight trauma searches are performed per day. (Tr. at 17)

11. The trauma search is conducted pursuant to Research Medical Center policy; it is not performed at the request of any Kansas City, Missouri Police Department officers or any other law enforcement or governmental agency. (Tr. at 14-15)

12. Often times, the trauma search takes place before on-duty officers or detectives even arrive at the hospital. (Tr. at 15)

13. The purpose of a trauma search is to ensure the Emergency Room stays safe. (Tr. at 14) Trauma patients do not go through a metal detector or get wanded when entering the hospital. (Tr. at 31) Their clothes and belongings are, therefore, searched to ensure the safety and security of hospital staff who are in the room with the patient. (Tr. at 31)

14. If contraband is found during a trauma search, the security officer secures the item(s), marks it using a sticker labeled with the individual's trauma number, prepares a property receipt, and turns the item(s) over to law enforcement. (Tr. at 15-16) A security officer then completes a written report. (Tr. at 19)

15. Research Medical Center is located in the Kansas City, Missouri Police Department's Metro Patrol Division. (Tr. at 28)

16. Deryck Galloway has worked for the Kansas City, Missouri Police Department for almost twenty-three years. (Tr. at 24) He is currently a detective in the Metro Patrol Division. (Tr. at 24, 28)

17. Detective Galloway has worked in an off-duty capacity at Research Medical Center for five to six years. (Tr. at 24, 25-26) He estimated he averaged eight to twelve four-hour shifts at Research Medical Center each month. (Tr. at 26)

---

[3] For example, a trauma search would be performed on an individual who fell off a ladder and sustained a head trauma or open wound, or an individual injured in a car wreck. (Tr. at 12)

3

18. Detective Galloway testified that while working in an off-duty capacity at Research Medical Center, he spends the majority of his time in Pod 3.   (Tr. at 27)

19. Detective Galloway wears his uniform and carries both his police radio and a security radio while working off duty at Research Medical Center.   (Tr. at 25, 27)

20. As a detective within the Metro Patrol Division, Detective Galloway's police radio is pre-programmed to the channel used by the Metro Patrol's officers and dispatchers.   (Tr. at 28-29)

21. Detective Galloway rarely turns on his police radio while working at the hospital.   (Tr. at 27)   He only does so to notify dispatch when there is a shooting victim so that on-duty officers can be dispatched to respond.   (Tr. at 28)   Detective Galloway, instead, listens to the security radio while working at the hospital because it allows him to secure backup from private security officers more quickly.   (Tr. at 27)

22. If a shooting victim arrives at Research Medical Center during his off-duty shift, Detective Galloway is notified by the hospital's security dispatcher and responds to the location in the hospital where the victim is located.   (Tr. at 30)

23. Detective Galloway then notifies the Kansas City, Missouri Police Department of the shooting victim using his police radio.   (Tr. at 30)   He has notified the Kansas City, Missouri, Police Department that a shooting victim has arrived at Research Medical Center more than one hundred times.   (Tr. at 30-31)

24. Detective Galloway waits for the Kansas City, Missouri Police Department to dispatch officers to the hospital.   (Tr. at 30)   While doing so, he either accompanies the victim into the hospital or stays with the vehicle that dropped off the victim.   (Tr. at 30)   If the shooting victim was dropped off by a car and the car left the hospital, Detective Galloway accompanies the victim to a room and stands outside.   (Tr. at 30)   If the car in which the victim arrived remains, Detective Galloway stays with the car until it can be secured by an on-duty officer.   (Tr. at 30)

25. Once an on-duty officer arrives, Detective Galloway returns to the location in the hospital where he was previously stationed.   (Tr. at 30)

26. On April 21, 2019, a gunshot victim was dropped off at Research Medical Center at approximately 5:30 p.m. and transported via wheelchair to a trauma room.   (Tr. at 43, 44)   Private Security Officer Cosby and off-duty Detective Galloway were both working at the time.   (Tr. at 18, 29, 41-42)

27. Security Officer Cosby conducted a trauma search of the victim's clothing and recovered a magazine and ammunition. (Tr. at 18)

28. Security Officer Cosby testified he did not specifically remember this April 21, 2019, trauma search. (Tr. at 18, 20) Despite not having a specific recollection, Security Officer Cosby testified that he followed the same procedure for every trauma patient and every trauma search. (Tr. at 19)

29. Security Officer Cosby had performed "hundreds" of trauma searches during the two years he worked at Research Medical Center. (Tr. at 20)

30. Detective Galloway was notified through hospital security dispatch on April 21, 2019, that a gunshot victim had arrived at the hospital. (Tr. at 29)

31. Detective Galloway notified the Kansas City, Missouri Police Department of the victim's arrival. (Tr. at 32, 35-36) At that time, Detective Galloway would not have been aware of a shooting that had occurred a short time earlier at East 29th Street and Mersington Avenue, a location within the East Patrol Division. (Tr. at 32) Likewise, Detective Galloway would not have known the victim's name. (Tr. at 32)

32. The Metro Patrol Division does not share a radio channel with the East Patrol Division. (Tr. at 39)

33. Detective Galloway testified he did not have a specific recollection of this gunshot victim arriving at Research Medical Center on April 21, 2019, or the corresponding events surrounding his notification to the Kansas City, Missouri Police Department. (Tr. at 34-35) His testimony was, instead, based on the procedure he always follows when a shooting victim arrives at the hospital. (Tr. at 35-36)

34. Jacob Alexander has been employed as an officer by the Kansas City, Missouri Police Department since 2014, working both as a general patrol officer and in a proactive unit within the Metro Patrol Division. (Tr. at 38) While on duty, Officer Alexander keeps his police radio on the Metro Patrol channel so that he can be aware of what is going on around him. (Tr. at 39-40) It is, therefore, uncommon for him to be aware of calls for service in other patrol divisions. (Tr. at 40)

35. Officer Alexander was on duty on April 21, 2019. (Tr. at 40) Upon being dispatched in connection with the gunshot victim, he responded to Research Medical Center. (Tr. at 18, 40-41) Officer Alexander did not know the name of the victim. (Tr. at 41)

36. When Officer Alexander arrived at the hospital, the trauma search had already been

5

performed. (Tr. at 43)  Security Officer Cosby gave Officer Alexander the magazine and ammunition and stated it had been located in the victim's pants. (Tr. at 18, 42, 48)  Officer Alexander was still unaware of the victim's name. (Tr. at 43)

37. Officer Alexander next contacted the victim in the trauma room to obtain identifying information and ask how he got shot. (Tr. at 44, 48)  The victim refused to identify himself or explain the circumstances of the shooting. (Tr. at 44)

38. While still at the hospital, Officer Alexander later learned that at approximately 5:15 p.m., officers within the East Patrol Division were dispatched to a shooting at East 29th Street and Mersington Avenue. (Tr. at 44-45)  Officer Alexander had not been immediately aware of this call for service since the Metro Patrol and East Patrol Divisions do not share a radio channel. (Tr. at 45)

39. The gunshot victim was later identified as Defendant. (Tr. at 43)  Law enforcement determined Defendant was involved in the shooting on Mersington Avenue. (Tr. at 45)  A review of Defendant's criminal history revealed he was prohibited from possessing ammunition due to a prior felony conviction. (Tr. at 46)

40. Kansas City, Missouri Police Department Detective Rusnac instructed Officer Alexander to recover Defendant's clothing as evidence. (Tr. at 46)

41. When recovering clothing as evidence, it is Officer Alexander's practice to go through the pockets in order to create an accurate list of all items being recovered. (Tr. at 46)  As a result of this practice, Officer Alexander testified he would have located the magazine and ammunition if it had not already been provided to him by Security Officer Cosby. (Tr. at 47)

### III. DISCUSSION

Defendant Brown challenges the April 21, 2019, search of his clothing.  He argues that the Kansas City, Missouri Police Department lacked probable cause to seize the ammunition and magazine.  The Government maintains that since law enforcement was not involved in the search that led to the discovery and seizure of the ammunition and magazine, there was no Fourth Amendment violation.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. CONST.

6

amend. IV. The Fourth Amendment "is wholly inapplicable, however, 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the [g]overnment or with the participation or knowledge of any governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980)). *See also United States v. Avalos*, 984 F.3d 1306, 1307 (8th Cir. 2021). "Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *United States v. Highbull*, 894 F.3d 988, 992 (8th Cir. 2019) (quoting *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010)(citation omitted)).

The Eighth Circuit focuses on three factors to determine whether a private individual is acting as, or with the participation of, a government official: "(1) whether the government had knowledge of and acquiesced in the intrusive conduct; (2) whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and (3) whether the citizen acted at the government's request." *Avalos*, 984 F.3d at 1308-09 (quoting *Highbull*, 894 F.3d at 992). "A defendant bears the burden of proving by a preponderance of the evidence that a private party acted as a government agent." *Highbull*, 894 F.3d at 992.

In this case, the trauma search of Defendant's clothing was performed by private security officer Terrance Cosby who was hired by Research Medical Center to provide extra security at the hospital. Defendant cannot satisfy his burden of proving that Security Officer Cosby acted as, or participated with, government officials thus triggering Fourth Amendment protections.

First, the Kansas City, Missouri Police Department did not know of or acquiesce to Security

7

Officer Cosby's search. Although neither Detective Galloway nor Security Officer Cosby specifically recalled the circumstances surrounding the April 21, 2019, trauma search, the Court finds credible their testimony that they followed standard procedure in this instance. Research Medical Center policy dictates that trauma searches be performed on the clothing and belongings of <u>all</u> trauma patients. (Facts 8, 10) The trauma search is performed by a private security guard who does not know the patient's name or any circumstances surrounding the precipitating injury. (Fact 9) The trauma search is often completed before on-duty officers arrive at the hospital. (Fact 12) Despite the suggestion in Defendant's reply brief, the evidence of record establishes that neither off-duty Detective Galloway or responding Officer Alexander knew Defendant's name or were aware of Defendant's involvement in the shooting on Mersington Avenue until after Security Officer Cosby had searched Defendant's clothing. (Facts 31, 35, 36, 37, 38) This factor weighs against concluding that Security Officer Cosby was acting as a government agent.

Examination of the second factor, the citizen's intent, results in the same conclusion. The Eighth Circuit has "been unwilling to impute agency where the private actor was not 'motivated solely or even primarily by the intent to aid the officers' and where the government did not request the challenged search." *Highbull*, 894 F.3d at 992 (citing *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004)). Security Officer Cosby testified that, pursuant to Research Medical Center policy, trauma searches are performed in every trauma case regardless of whether criminal conduct could be involved. (Fact 10) Although any recovered contraband is turned over to law enforcement, the purpose of a trauma search is to keep the Emergency Room, and the medical staff and patients located therein, safe and secure. (Fact 13)

Lastly, Security Officer Cosby did not perform the trauma search at the request of Kansas

8

City, Missouri Police Department police officers or any other governmental agency. (Facts 8, 11, 28) Again, the search was at the direction of Research Medical Center, not at the direction of either Detective Galloway or Officer Alexander. This third factor also weighs against deeming Security Officer Cosby a government agent.

The Court finds that Security Officer Cosby acted as a private individual when he searched Defendant's clothing. Officer Alexander's recovery from Security Officer Cosby of the magazine, ammunition, and Defendant's clothing, therefore, did not violate the Fourth Amendment. *Cf. Jacobsen*, 466 U.S. at 119 (holding law enforcement's "viewing of what a private party had freely made available for . . . inspection did not violate the Fourth Amendment").

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ *Jill A. Morris*
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE